In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-05-00113-CV
______________________________


 
 
IN THE INTEREST OF M.J.F., A CHILD
 
 


                                              

On Appeal from the County Court at Law
 Rusk County, Texas
Trial Court No. 2003-12-583B-CCL


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Chief Justice Morriss


MEMORANDUM OPINION
            There was considerable stress at the home of Michael Faison and his wife, Sonja Faison. 
Michael and Sonja had resumed living together as husband and wife after a separation, during which
separation Michael had fathered a child, M.J.F., with Wreathye Guerrero. Part of the stress arose
as Sonja was thrust into the role of caring for M.J.F., another woman's child. 
            December Faison, one of Michael and Sonja's young children, reportedly described an event
occurring after Michael and Sonja resumed living together. In this event, when M.J.F. started crying,
Sonja hit him repeatedly on the head and kept hitting him until he quit crying and "went to sleep." 
While living with Michael and Sonja, M.J.F. was once admitted to a hospital with multiple bruises,
which admission resulted in a $20,000.00 hospital bill. 
            M.J.F.'s mother, Wreathye, is not without her problems either. Wreathye has had substance
abuse problems. After a year and a half of working with agency officials in dealing with parenting
issues, Wreathye still admits to using alcohol and marihuana, and managed to achieve only thirteen
days' sobriety immediately preceding the trial of this case. The Texas Department of Family and
Protective Services (the Department), decided to seek to terminate Wreathye's parental rights because
she drove while intoxicated with M.J.F. in the car. 
            Michael and Wreathye each appeal the termination of their parental rights to M.J.F. They
each assert that the evidence is legally and factually insufficient to support findings that they
respectively endangered M.J.F., that they respectively placed him in dangerous conditions, and that
termination of their respective parental rights is in M.J.F.'s best interest.
            Based on our own extensive review of the evidence in the record, we affirm the termination
of Michael's and Wreathye's parental rights to M.J.F. because we hold that:
            (1) Legally and factually sufficient evidence


 supports the finding of the trial court that
Wreathye knowingly placed or allowed M.J.F. to be in conditions or surroundings that endangered
M.J.F.'s physical or emotional well-being. See Tex. Fam. Code Ann. § 161.001(1)(D) (Vernon
Supp. 2006).

            (2) Legally and factually sufficient evidence supports the finding of the trial court that
Michael knowingly placed or allowed M.J.F. to be in conditions or surroundings that endangered
M.J.F.'s physical or emotional well-being. See Tex. Fam. Code Ann. § 161.001(1)(D).

            (3) Legally and factually sufficient evidence supports the finding of the trial court that
Wreathye engaged in conduct, or knowingly placed M.J.F. with persons who engaged in conduct,
which endangered M.J.F.'s physical or emotional well-being. See Tex. Fam. Code Ann.
§ 161.001(1)(E) (Vernon Supp. 2006).

            (4) Legally and factually sufficient evidence supports the finding of the trial court that
Michael engaged in conduct, or knowingly placed M.J.F. with persons who engaged in conduct,
which   endangered    M.J.F.'s   physical   or   emotional   well-being.   See   Tex.   Fam.   Code 
Ann. § 161.001(1)(E).

            (5) Legally and factually sufficient evidence supports the finding of the trial court that
termination of Wreathye's parental rights to M.J.F. is in M.J.F.'s best interest. See Tex. Fam. Code
Ann. § 161.001(2) (Vernon Supp. 2006).

            (6) Legally and factually sufficient evidence supports the finding of the trial court that
termination of Michael's parental rights to M.J.F. is in M.J.F.'s best interest. See Tex. Fam. Code
Ann. § 161.001(2).

The Evidence
            In our evidentiary review which yielded the following recitation of evidence, we have found
no evidentiary disputes which could not reasonably be resolved in favor of termination by reasonable
fact-finders. We also find no fact-finder determinations based on credibility of witnesses that we
conclude were unreasonable. As to each issue, we conclude a reasonable fact-finder could have
found the evidence clear and convincing in support of termination. In light of the entire record, we
conclude the evidence allows the fact-finder reasonably to form a firm belief or conviction
supporting each element of proof supporting termination.
            Each statement recounted in this section of this opinion—whether or not it is explicitly
attributed to the witness—is taken from the witness' statements and is not the opinion or conclusion
of this Court.
            A. Donald Winstead Testimony
            Dr. Donald Winstead, a licensed psychologist in private practice who devotes a large part of
his practice to families involved with Child Protective Services (C.P.S.), testified at length.
            Sonja admitted she had slapped her daughter, December. Sonja's attitude toward corporal
punishment suggests that she might overuse that form of correction and that Sonja is likely to be
threatened by a child's normal actions striving for independence. 
            Sonja and Michael's marriage was subject to many stresses, including M.J.F. Winstead
expressed "some concerns" that keeping M.J.F. in Sonja and Michael's home would be in his best
interest, if the issues that existed in the marriage continued. 
            Winstead evaluated Michael and found that Michael had a personality disorder, including
narcissistic, antisocial, and schizoid features. Michael was evaluated as being acceptable on corporal
punishment, appropriate expectations of children, and empathy with children. Michael's test results
were a concern in the area of being prone to role reversal, that is, being too focused on the child
meeting his needs rather than the normal pattern. Michael also showed a propensity to be threatened
by children's assertion of independence. Because Michael had been abused as a child, he has a
higher chance of being an abuser. Michael admitted prior substance abuse to Winstead, but claimed
three years' sobriety. Michael acknowledged "a lot of" past serious relationships. If Sonja injured
M.J.F., it would be important for Michael to accept that as fact. Michael did not believe Sonja had
injured M.J.F. Per Winstead, if M.J.F. was a special needs child, parental role reversal would create
significant problems and frustration risks. 
            Because Winstead had not seen M.J.F., Michael, or Sonja recently, it is difficult to assess
whether M.J.F. should be placed in Michael and Sonja's home, but if their situation has not changed,
i.e., if the problems persist, it would concern Winstead to place M.J.F. in that home. 
            Winstead diagnosed Wreathye as a substance abuser. The rough edges to Wreathye's
personality were pronounced enough to suggest she may have a personality disorder. She had
obsessive compulsive and histrionic traits. Winstead expressed having concerns about Wreathye's
ability to protect M.J.F., given her substance abuse problem. When she first started counseling with
Winstead, Wreathye was not fully ready to admit to having a drinking problem, but came to a
counseling session with alcohol on her breath. It is very traumatic for a child to see his or her parent
get arrested for drunk driving. Substance abuse has a high correlation with being a leading cause of
child abuse. If Wreathye continued to have problems with substance abuse, Winstead would have
a lot of concerns about placing M.J.F. with her. Wreathye did not have a good support system in
place, as is needed for her to maintain her progress in recovery from substance abuse. 
            On the other hand, Winstead testified that Wreathye brought M.J.F. to Winstead's office, at
which time Winstead observed that her interactions with M.J.F. were always appropriate, she was
attentive and concerned, and she did a good job with M.J.F. Winstead also opined that, if Wreathye
could get past her substance abuse problems and progress on her emotional issues, such as self-esteem and personality matters, the rest of her parenting skills seem to be good. 
            Per Winstead, Michael struggles with self-centeredness and the tendency to exploit or take
advantage of others, and is in a relationship to figure out what he can get for himself. 
            On the other hand, Winstead indicated that Michael has empathy and normal expectations
for children. Though Michael had been a serious drug abuser and had been physically abused during
childhood, he apparently had been sober and dry for a few years. Michael had the strength to remain
sober and dry. Winstead further indicated that Wreathye had the possibility of remaining sober and
dry. 
            M.J.F. was developmentally delayed in his speech, motor skills, and "things like that."
            Combine the factors of Sonja's propensity to be angry regarding her marital issues, her
inappropriate attitude toward corporal punishment, her past experience of actual physical abuse of
children in her care, and a child, M.J.F., produced by Michael's recent sexual relationship with
Wreathye while Michael and Sonja were married but separated, and you have an explosive potential. 
All that increased Winstead's concern. Wreathye reported to Winstead that Michael had been
physically and emotionally abusive to Wreathye during their relationship. 
            Wreathye was charged with driving while intoxicated (D.W.I.), with M.J.F. as a passenger
in the vehicle. Winstead believes there are significant risks to M.J.F.'s health and life for Wreathye
to continue as his mother. 
            Once Michael decided to stay with Sonja, Winstead believes that the risks Sonja poses to
M.J.F. are effectively imputed to Michael, so long as they are together. Michael is thus exposing
M.J.F. to known risks, which runs counter to M.J.F.'s best interest. 
            Physical abuse in the presence of a child, even if not directed at the child, endangers his or
her well-being. And, given Sonja's prior abusive behavior and Michael's personality disorders,
Michael might not have the strength to protect M.J.F. from Sonja, causing concerns for M.J.F.'s
safety in that home. 
            Based on what Winstead has learned about Wreathye, there is a significant probability that
Wreathye will not be able to "pull it together" and do what is needed to parent her child. Even if
M.J.F. is not adoptable, the alternative prospects are preferable to being a child of either Michael or
Wreathye. 
            B. Wreathye Guerrero Testimony
            Wreathye admitted that she has had multiple episodes of being arrested, being assaulted, or
having crimes committed in the presence of her children, including M.J.F. There were multiple
times Wreathye had been drinking alcohol when she appeared at a hospital. There were other drugs
she used habitually, including benzodiazepines. Wreathye's record is replete with examples of her
abusing alcohol or marihuana and of missing counseling and rehabilitation meetings. Wreathye has
violated the terms of court orders and service plans. 
            On the other hand, Wreathye testified that she is attentive to M.J.F. and has brought him
things he needs. She says she and M.J.F. bonded together well. 
            Drugs and alcohol have had a powerful hold on Wreathye so that she has had a difficult time
turning loose of them. 
            Wreathye feels she can offer M.J.F. a home and take care of him appropriately. She does not
believe it is in M.J.F.'s best interest for her parental rights to be terminated. 
            Even while this case has been going on, while Wreathye has been under scrutiny, she has had
lapses and used drugs and alcohol. Although knowing for some time that she needs to obtain an
Alcoholics Anonymous sponsor, Wreathye has not obtained one, except that, for a short time, she
got a fellow A.A. attender to be her sponsor, notwithstanding that he was also in treatment for
alcohol abuse. 
            Wreathye admitted in her trial testimony given June 28 that she last used an intoxicating
substance June 15, thirteen days earlier, at which time she used marihuana. 
            C. Michael Faison Testimony
            Michael admitted he has been convicted for felony delivery of marihuana. That conviction
occurred before his marriage to Sonja. Sonja knew of it. 
            Michael indicated that he did not find out about Sonja's involvement with C.P.S. until he got
involved with C.P.S. in Rusk County. 
            Michael testified that, right after Michael and Sonja resumed living together, Wreathye was
arrested for public intoxication outside Michael's trailer, and as a result, Michael took M.J.F. 
            Sonja had told Michael that she had accidentally "grazed" M.J.F.'s eye with the telephone
receiver and that young


 Michael had dropped M.J.F. Michael told Katy Wady, a C.P.S. caseworker,
that things at the Faison home were stressful because of the situation which included taking care of
an infant child produced by an extramarital affair. Michael's best recollection is that he reported
M.J.F. falling from bed and M.J.F. getting "grazed" by the telephone receiver. 
            When Michael saw Wreathye intoxicated on October 25, she was one of two possible drivers
at the time, and she was apprehended by police for public intoxication. On a different occasion,
Wreathye appeared at Longview Regional Hospital and, in a way, Michael agreed with the doctors'
opinion that Wreathye was intoxicated at that time. For a time, Michael did not realize that
Wreathye's alcoholism posed a problem for her parenting of M.J.F., but then he realized it did. 
            Michael does not believe the hematomas on M.J.F.'s body were caused by Sonja. If Michael
retained parental rights to M.J.F., M.J.F. would live with Michael and Sonja in their home. After
the injury to M.J.F. requiring hospitalization, there was a $20,000.00 hospital bill. 
            Michael has been sober, or clean, since the end of 2001. 
            In 1998, Michael sold marihuana to an undercover policeman. Michael was using drugs
when he and Sonja married and when they separated. Before 2001, he had been heavily into "hard
drugs" since approximately 1984. 
            In 2003, Sonja decided to reunite with Michael, and Michael, recognizing his obligation to
his estranged wife, chose her over Wreathye. Back in the home environment, though it was stressful,
the other kids "took to" M.J.F., and he did well. Though M.J.F. sustained some bumps, from the
accident with the telephone receiver and from the other children picking him up, he was not abused. 

            Michael became concerned about M.J.F. because of his enlarged head and his unusual
behavior, and took him to see a doctor. M.J.F. was taken by air flight to Dallas for medical
evaluation. Michael was stressed out. He talked with the doctors, support staff, and "everyone." 
C.P.S. came later and took the children. 
            Before the children were removed, when Wreathye was arrested, she had left her car in front
of Michael's house with M.J.F.'s car seat still inside. Michael retrieved the car seat, but had to take
it apart to adjust the straps because they did not properly connect. 
            Michael does not believe Sonja caused any injuries to M.J.F. It would be unjust to require
him to get a divorce from Sonja unless she is proven to have hurt M.J.F. Michael is willing to forego
temporary custody pending the outcome of Sonja's criminal proceeding, which he believes will be
an acquittal. Michael does not believe it would be fair to terminate Wreathye's parental rights. 
While separated from Sonja, Michael tried to help support M.J.F. Recently, Michael has been doing
his best to stay "clean" (drug free), notwithstanding that he had been an addict. Michael did not
know about an instance in which C.P.S. investigated possible abuse by Sonja against her children
in Houston. 
            M.J.F. was born with an enlarged head. That may have been related to Wreathye's history
of drinking. 
            Michael saw M.J.F. fall off the bed at Wreathye's house, hurting himself. M.J.F. has also
fallen off the bed in Michael and Sonja's house. Michael knows of four different occasions in which
M.J.F. fell or was dropped. 
 
            D. Rita DeShannon Testimony
            Rita DeShannon was with the Rusk County Child Advocacy Center in 2004 when she
interviewed December Faison and young Michael Faison, the two children of Michael and Sonja.
DeShannon does not remember two children from the same family both blurting out information,
at the very beginning of their interviews, about mama hitting "the baby," as December and young
Michael did when they were interviewed. The fact that December spontaneously used the slang
"weed" for marihuana in her interview enhances the believability of her claim of marihuana use by
Michael. 
            E. Kelly Smith Testimony
            Kelly Smith, a self-employed, licensed professional counselor contracting with C.P.S. and
with the Children's Advocacy Center, testified that, in Smith's play therapy and counseling sessions
with December starting in May 2004, Smith noticed evidence in December's play that indicated
violence in Michael and Sonja's home. December told Smith that, once when M.J.F. was crying,
Sonja hit him repeatedly on the head and kept hitting him until he quit crying and "went to sleep." 
Before hearing that story, Smith knew that Sonja had injured M.J.F., but had not discussed that with
December. December's revelation seemed to Smith spontaneous and not coached. In Smith's play
therapy and counseling sessions with young Michael, he also exhibited evidence of a great deal of
violence in his home environment. And young Michael talked about the violence in his home. 
Young Michael told essentially the same story about M.J.F.'s crying and Sonja hitting him repeatedly
to make him stop crying. According to young Michael, the source of violence in the home was
Sonja. Smith does not recall young Michael and December ever mentioning whether Michael was
present when Sonja was violent in the home. 
            Young Michael's depictions of violence and his aggression were extreme. December drew,
and played out, violence and aggression quite a bit. A child who is raised in an abusive and violent
home tends to grow up to be an abusive adult. December said that, on different occasions, she was
"whipped" with an extension cord that left bruises and marks on her, which, in Smith's opinion,
would be difficult for a father or stepfather not to notice. So, it would not be in the best interest of
the children for them to be taken care of by Michael. December drew pictures of violence and anger
and played out, with dolls, scenarios of violence. 
            F. Amanda Prewitt Testimony
            Amanda Prewitt, a social worker employed by the Department, testified that she saw M.J.F.
at the time of his discharge from the hospital and noticed that he was small, slender, and pale, with
a large head—a head which had a large lump, bump, or protruding area. 
            Wreathye did some, but not all, of the things to comply with her family service plan. She did
some work, but did not continue it. Wreathye maintained her housing, but she did not comply with
the counseling requirements. 
            During monitored visits with the children, there were arguments between Sonja and Michael
in the presence of the children. 
            Michael, in conversations with Prewitt about M.J.F.'s injuries, maintained his belief that
Sonja was not responsible for abusing M.J.F., that he knew Sonja had a C.P.S. history and that she
might hurt an older child, but not a seven-month-old baby, such as M.J.F. Michael knew that,
sometimes when he came home from work and M.J.F. had been in Sonja's care, M.J.F. would have
a cut, a red mark, or such, and was crying. Michael knew Sonja was stressed from all the marital
issues they were having, trying to put the relationship back together, taking care of someone else's
child—many stresses. 
            The Department recommends that parental rights to M.J.F. be terminated and that he be
adopted. That would be in the best interest of M.J.F. 
            M.J.F. was injured only at Michael and Sonja's home, not while in Wreathye's possession. 
            Per Prewitt, Michael knew of Sonja's proclivity to injure a child. But Prewitt has no reason
to doubt the truth of Michael's claim that he did not know of Sonja's C.P.S. history in Houston until
M.J.F. was removed from the home. Because Wreathye could have learned of Sonja's C.P.S. history
only by Michael telling her, she could not have known any earlier. 
            When Wreathye came to visit M.J.F., she was one of the few parents Prewitt recalled who
came with toys on her own, and also brought diapers, wipes, videos, and the like. Wreathye
demonstrated a good relationship with M.J.F. and took excellent care of him during those visits. 
During Wreathye's visits with M.J.F., M.J.F. seemed to improve markedly. Except for her substance
abuse problems, Wreathye appears to be a good mother.
            The Department's intent to work with Wreathye ended with her arrest for D.W.I., and M.J.F.
was taken as a result. It is because of that D.W.I. that the Department seeks to terminate Wreathye's
rights. 
            During a six-week period, M.J.F. was in the presence of at least six caretakers. 
             A different foster parent, a Mrs. Berry, reported December as saying that Sonja would hit "the
baby" on the hand, and if it continued crying, then on the "butt," and if it continued crying, would
"pop" it on the back of the head. December reportedly cried and asked Mrs. Berry not to report that
to Michael because he would tell Sonja, and December would "get it." 
            One reason M.J.F. blossomed might be that he was receiving additional help, not just his
contact with Wreathye. 
            Even while under scrutiny, Wreathye has not performed to the minimal standards of a parent. 
            G. Judith Ward Testimony
            Judith Ward, the guardian ad litem for M.J.F. and an assistant program manager for East
Texas Court Appointed Special Advocates, recommends termination of the parental rights of both
parents to M.J.F. As to Wreathye, it is because, after a year and a half, she still admits to using
alcohol and marihuana, and at the time of trial had maintained only thirteen days' sobriety. Ward
believes it is a terrible risk to put a child with someone with that kind of record. As to Michael, after
a year and a half, he continues to be in denial about Sonja's problems. He gives insufficient or
unbelievable reasons for M.J.F.'s injuries. He has not provided M.J.F. a safe environment. Michael
has not been cooperative with CASA. He is argumentative and angers easily. Ward opines that it
is in M.J.F.'s best interest for Wreathye's and Michael's parental rights to be terminated and for
M.J.F. to be placed for adoption. 
            On the other hand, Ward testified that Wreathye has cooperated with CASA and has done
all they asked of her, except remaining sober. When Wreathye got M.J.F. back, he blossomed. She
was "wonderful." 
            Although Wreathye cooperated and was otherwise a good parent, she had the D.W.I. with
M.J.F. in the car and put him in danger again. That was a great disappointment. 
            CASA approves of Lawrence and Terry Gower as prospective adoptive parents, because of
an impressive lifestyle and the fact that they have current experience in dealing with their own child
that does not hear or speak. That is a plus because of M.J.F.'s challenged condition. 
            H. Faye Hubbard Testimony
            Fay Hubbard, a supervisor with the Department, testified that Michael's parental rights to
M.J.F. should be terminated because he cannot or has not provided M.J.F. a safe environment,
permanency, protection, or nurture. Hubbard testified that the following risk areas were met: M.J.F.
is five years old or younger or otherwise unable to protect himself; M.J.F. is physically or mentally
impaired or needs special care; Wreathye and Michael were "unwilling/unable to protect the child";
Wreathye and Michael "significantly lack child development knowledge"; Wreathye and Michael
have "unrealistic expectations of child or frequently fail to understand the child's needs"; Wreathye
and Michael "significantly lack parenting skills to meet the child's behavioral or developmental
needs"; Wreathye and Michael "lack impulse control"; Wreathye and Michael are "unable to cope
appropriately with stress"; Wreathye and Michael have a "history of drug/alcohol abuse"; a
"caregiver [was] abused/neglected as [a] child"; a "caregiver [is] so self-centered or needy that
his/her needs are put above the child's"; a "child [has] experienced significant separation from the
primary caregiver"; a child was "scapegoated, rejected, humiliated, or treated differently by a
caregiver"; M.J.F. "suffered physical injuries or sexual abuse"; abuse or neglect "require[d]
immediate medical care"; "[a]ctual or potential harm [was] severe"; a "child [was] born addicted or
exposed to drugs or alcohol"; there has been "a prior abuse or neglect investigation"; "a child" has
been "inadequately supervised or left with inappropriate caregiver"; a "child [has] been removed
from home by [a] protective agency"; a "prior incident resulted in a severe outcome"; incidents are
"escalating in severity"; more people are "becoming involved, either as victim or perpetrator"; the
family is "experiencing recent significant stress"; behaviors of some "household member endanger[s]
the child"; the family is "isolated or supported by extended family"; the social relationships of
caregiver are "primarily negative"; Michael has a history of abusing a spouse; Wreathye has "been
[a] victim of spousal abuse"; Wreathye has a "history of criminal involvement"; Michael "promote[s]
violence"; Wreathye and Michael "deny, seem unaware of, or take allegations less seriously than
[the Department]"; Wreathye and Michael are "unmotivated/unrealistic about change"; and Wreathye
and Michael "offer implausible explanations, attempt to deliberately mislead [the Department], or
refuse to disclose important information." 
            According to Hubbard, termination would be in M.J.F.'s best interest, based on the totality
of the situation. Michael is still unable to provide a protective environment. The Department's
recommendation of termination and adoption seeks to get M.J.F. into a safe, secure, and stable
environment. Wreathye is not going to be able to parent. 
            I. Megan Crim Testimony
            Megan Crim, a conservatorship worker with the Department, testified that, after the
monitored return of M.J.F. into Wreathye's possession was found to be unsafe, Crim and Prewitt
went to retrieve M.J.F. from Wreathye. Wreathye's D.W.I. with M.J.F. in the car is conduct which
endangers the physical well-being of M.J.F. One condition of Wreathye's service plan was to attend
Alcoholics Anonymous or Narcotics Anonymous meetings, which she did sporadically. Part of
Wreathye's service plan required her to get at least a part-time job. Crim had no record that
Wreathye ever got a job. Since M.J.F. was removed from Wreathye's possession, he has progressed
well. 
            On the other hand, Crim noted that Wreathye attended seventeen meetings in April. A
"monitored return hearing order" dated October 19, 2004, indicates that, at that time, Wreathye had
demonstrated adequate and appropriate compliance with the service plan as of that date, and says the
same thing about Michael. The order says that Wreathye was willing and able to provide M.J.F. a
safe environment and that return of M.J.F. to Wreathye was in the child's best interest. The only
subsequent development was Wreathye's D.W.I. event with M.J.F. in the car. 
            J. Rick Sirls Testimony
            Rick Sirls, a substance abuse counselor with the Woodbine Treatment Center, testified that 
he ordered a drug test of Wreathye, and she had admitted to smoking marihuana and drinking
alcohol. This was on an occasion when he smelled alcohol on her. The test came back positive for
alcohol, but not for marihuana. The clinic tested Wreathye twice more at later dates, but both tests
proved negative for "all substances." Not getting an A.A. sponsor after some delay would be a
matter of concern for Wreathye's chances for success. 
            On the other hand, Sirls opined that, with a positive support network, Wreathye ought to have
good chances to stay clean and sober. 
            K. Terry Gower Testimony
            Terry Gower, the foster mother in possession of M.J.F. at the time of trial, testified that she
has a natural child who is deaf and blind at age thirty-four. When M.J.F. came into the Gowers'
home, M.J.F. was afraid of everything, except Gower's eighty-year-old mother, to whom he went
readily. M.J.F. has some unusual fears that they are working on, including a terrible fear of the
garage, and a terror of even ankle-deep water. He is developmentally delayed. In January, when
M.J.F. came into Gower's care, he had few or no language skills, and even now he has only around
fifty words, which is "far behind." He was walking. He was not walking well or climbing stairs by
himself. He had motor skills problems. On Tuesdays, a lady from "E.C.I." comes out and works
with M.J.F. for forty-five minutes. In the approximately five months since M.J.F. has been with
Gower, M.J.F. is quite different, more confident, more friendly and open, showing no remaining fear
of people. He talks to everybody, not being understood, and everybody loves him. He is learning
sign language and uses it with his words. There are other foster children that play well with him and
mother him. Gower would like to adopt M.J.F. M.J.F. is catching up and making great strides. But
he still has limited vocabulary and is far behind normal children his age. Gower understands some
of his words, but others not without his sign language accompanying them. Though M.J.F. was in
a very regressed condition when he joined the Gower family, since that time he is making remarkable
progress. M.J.F. is a special needs child and likely will remain so. As such, stability, routine, and
dependability are extremely important to his best interest. Gower and her husband are willing to
provide long-term care for M.J.F. with or without adoption. Gower and her husband are reimbursed
$23.00 per day for M.J.F.'s care expenses, but whether they get that reimbursement really does not
matter to them. 
(1)       Legally and Factually Sufficient Evidence Supports the Finding of the Trial Court that 
            Wreathye Knowingly Placed or Allowed M.J.F. to be in Conditions or Surroundings that 
            Endangered M.J.F.'s Physical or Emotional Well-Being
            One of the substantive grounds for termination of Wreathye's parental rights to M.J.F. urged
by the State and found by the trial court is that Wreathye has "knowingly placed or knowingly
allowed [M.J.F.] to remain in conditions or surroundings which endanger [his] physical or emotional
well-being . . . ." See Tex. Fam. Code Ann. § 161.001(1)(D). The evidence recited above is such
that a reasonable fact-finder could form a firm belief or conviction that Wreathye knowingly placed
M.J.F., or allowed him to be placed, in at least two types of endangering conditions or surroundings,
(a) Wreathye's substance abuse or criminal violations and (b) Michael's potential for physical and
emotional abuse.
            The evidence is uncontested that Wreathye continued, until just a few days before trial, to
engage in substance abuse, even in M.J.F.'s presence. While there is no direct evidence in the record
that Michael abused M.J.F., there is evidence that Wreathye was an abuse victim at Michael's hands
and knew of his tendency to be abusive.
            The evidence is legally and factually sufficient to support the finding that Wreathye
knowingly placed or allowed M.J.F. to be placed in conditions or surroundings that endangered his
physical or emotional well-being. See Tex. Fam. Code Ann. § 161.001(1)(D).
(2)       Legally and Factually Sufficient Evidence Supports the Finding of the Trial Court that             Michael Knowingly Placed or Allowed M.J.F. to be in Conditions or Surroundings that             Endangered M.J.F.'s Physical or Emotional Well-Being
            The State urged and the trial court also found that Michael had "knowingly placed or
knowingly allowed [M.J.F.] to remain in conditions or surroundings which endanger [his] physical
or emotional well-being . . . ." Tex. Fam. Code Ann. § 161.001(1)(D). The evidence recited above
is such that a reasonable fact-finder could form a firm belief or conviction that Michael knowingly
placed M.J.F., or allowed him to be placed, in three types of endangering conditions or surroundings,
(a) Sonja's physical abuse, (b) Wreathye's substance abuse or criminal violations, and (c) physical
violence and emotional turmoil in Michael and Sonja's home.
            Michael denies knowing of Sonja's abusive behavior and claims she was not actually abusive. 
One could argue that his denials concerning his knowledge are undisputed. But there is evidence
that could have been believed by a reasonable fact-finder that Sonja was guilty of physical abuse,
including numerous injuries to M.J.F. while in her care, reports by December and young Michael
confirming Sonja's abusive behavior against M.J.F., the other children's fears of retribution for
reporting that abuse, and December being "whipped" with an extension cord, an event which, in the
opinion of witness Smith, would be unlikely to escape Michael's notice. A reasonable fact-finder
could have disbelieved Michael's protestations that he knew nothing about Sonja's abusive behavior. 
Likewise, a reasonable fact-finder could have concluded also that Michael knew of physical violence
and emotional turmoil in his own home.
            There is no real dispute that Michael knew about Wreathye's continued substance abuse, at
least sometimes in M.J.F.'s presence.
            The evidence is legally and factually sufficient to support the finding that Michael knowingly
placed or allowed M.J.F. to be in conditions or surroundings that endangered M.J.F.'s physical or
emotional well-being. See Tex. Fam. Code Ann. § 161.001(1)(D).
(3)      Legally and Factually Sufficient Evidence Supports the Finding of the Trial Court that             Wreathye Engaged in Conduct, or Knowingly Placed M.J.F. with Persons Who Engaged in             Conduct,Which Endangered M.J.F.'s Physical or Emotional Well-Being
            The second substantive ground for termination of Wreathye's parental rights to M.J.F. is that
she "engaged in conduct or knowingly placed [M.J.F.] with persons who engaged in conduct which
endangers [his] physical or emotional well-being . . . ." See Tex. Fam. Code Ann. § 161.001(1)(E). 
The evidence recited above is such that a reasonable fact-finder could form a firm belief or
conviction that Wreathye had engaged in endangering conduct, including (a) substance abuse in
M.J.F.'s presence and also while pregnant with M.J.F., (b) driving while intoxicated with M.J.F. in
the car, and (c) driving M.J.F. without a properly adjusted car seat.
            The evidence is legally and factually sufficient to support the finding that Wreathye engaged
in conduct, or knowingly placed M.J.F. with persons who engaged in conduct, which endangered
M.J.F.'s physical or emotional well-being. See Tex. Fam. Code Ann. § 161.001(1)(E).
(4)       Legally and Factually Sufficient Evidence Supports the Finding of the Trial Court that             Michael Engaged in Conduct, or Knowingly Placed M.J.F. with Persons Who Engaged in             Conduct, which Endangered M.J.F.'s Physical or Emotional Well-Being
            The second ground for termination of Michael's parental rights to M.J.F. is also that Michael 
"engaged in conduct or knowingly placed [M.J.F.] with persons who engaged in conduct which
endangers [his] physical or emotional well-being . . . ." Tex. Fam. Code Ann. § 161.001(1)(E). The
evidence recited above is such that a reasonable fact-finder could form a firm belief or conviction
at least that (a) Michael allowed Sonja to care for M.J.F., notwithstanding his knowledge of her
violent tendencies, and (b) Michael allowed Wreathye to care for M.J.F. notwithstanding his
knowledge of her ongoing substance abuse.
            The evidence is legally and factually sufficient to support the finding that Michael engaged
in conduct, or knowingly placed M.J.F. with persons who engaged in conduct, which endangered
M.J.F.'s physical or emotional well-being. See Tex. Fam. Code Ann. § 161.001(1)(E).
(5)       Legally and Factually Sufficient Evidence Supports the Finding of the Trial Court that             Termination of Wreathye's Parental Rights to M.J.F. is in M.J.F.'s Best Interest
            In addition to finding a substantive basis for terminating parental rights, such as we address
above, the trier of fact must have found, as it did, that termination of Wreathye's parental rights to
M.J.F. is in M.J.F.'s best interest. See Tex. Fam. Code Ann. § 161.001(2). There is a strong
presumption that the best interest of the child is served by keeping custody with the natural parent. 
See In re D.M., 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.). The parents' rights,
however, are not absolute; protection of the child is paramount. In re A.V., 113 S.W.3d 355, 361
(Tex. 2003).
            A nonexclusive list of factors established by the Texas Supreme Court helps measure the best
interest of the child: (a) the desires of the child, (b) the emotional and physical needs of the child
now and in the future, (c) the emotional and physical danger to the child now and in the future,
(d) the parental abilities of the individuals seeking custody, (e) the programs available to assist these
individuals to promote the best interest of the child, (f) the stability of the home or proposed
placement, (g) the acts or omissions of the parent, which may indicate that the existing parent-child
relationship is not a proper one, and (h) any excuse for the acts or omissions of the parent. See
Holley v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976). Best interest, however, does not require
proof of any unique set of factors, nor does it limit proof to any specific factor. See In re H.R., 87
S.W.3d 691, 700 (Tex. App.—San Antonio 2002, no pet.). Much of the evidence touches on a
number of these factors.
            Although at the time of trial M.J.F. was incapable of making his desires known, there is
considerable evidence as to his emotional and physical needs, the emotional and physical dangers
to him, the relative parenting abilities of Wreathye and the Gowers, the relative stability of the homes
of Wreathye and the Gowers, and acts and omissions of Wreathye.
            Of course, the same evidence that supports the substantive findings against Wreathye also
weigh in favor of the finding in the trial court. But, in addition, the record contains a diagnosis that
Wreathye has personality defects that impact her parenting suitability. The undisputed evidence that
M.J.F. is especially vulnerable and has special needs, arising from his disabilities, strengthens the
finding that termination is in his best interest. While there is contrary evidence, it is neither so
voluminous, nor is it of a quality or type, such that it would mandate a contrary finding on M.J.F.'s
best interest. Finally, there is substantial evidence that the Gowers would make good alternative
parents for M.J.F.
            There is legally and factually sufficient evidence to support the finding that termination of
Wreathye's  parental  rights  to  M.J.F.  is  in  M.J.F.'s  best  interest.  See  Tex.  Fam.  Code  Ann.
§  161.001(2). 
(6)       Legally and Factually Sufficient Evidence Supports the Finding of the Trial Court that             Termination of Michael's Parental Rights to M.J.F. is in M.J.F.'s Best Interest
            In addition to finding a substantive basis for terminating Michael's parental rights, the trier
of fact must have found, as it did, that termination of Michael's parental rights to M.J.F. is in M.J.F.'s
best interest. See Tex. Fam. Code Ann. § 161.001(2). The same guidelines and factors apply here
as in dealing with the same issue as to Wreathye's parental rights. 
            Although M.J.F. is currently incapable of making his desires known, there is considerable
evidence as to his emotional and physical needs, the emotional and physical dangers to him, the
relative parenting abilities of Michael and Sonja as well as the Gowers, the relative stability of the
homes of Michael and Sonja and the Gowers, and Michael's acts and omissions along with some 
excuses offered for those acts or omissions.
            As we noted in Wreathye's case, the evidence that Michael was guilty of substantive
violations authorizing termination also weigh in favor of the finding that termination of Michael's
parental rights would be in M.J.F.'s best interest. The evidence tending to support or subvert a
finding of best interest as to Michael is similar to that supporting or subverting such a finding as to
Wreathye. There is also evidence that Michael, too, has been diagnosed with personality defects,
which impact on his parenting abilities.
            There is legally and factually sufficient evidence to support the finding that termination of
Michael's  parental  rights  to  M.J.F.  is  in  M.J.F.'s  best  interest.  See  Tex.  Fam.  Code  Ann.
§ 161.001(2).
            Because there is legally and factually sufficient evidence to support all findings necessary to
the judgment, we affirm the judgment of the trial court.
 
                                                                                    
                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:          July 13, 2006
Date Decided:             September 1, 2006